Norman BIRNBAUM, B. Leonard Avery
and Mary Rule MacMillen,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

Nos. 935, 976, 977, Dockets 77–6175,
77–6181, 77–6183.

United States Court of Appeals,
Second Circuit.

Argued May 3, 1978.

Decided Nov. 9, 1978.

320

John M. Rogers, Atty., Dept. of Justice, Washington, D. C. (Barbara Allen Babcock, Asst. Atty. Gen., Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., and David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for defendant-appellant.

Michael Krinsky, New York City (Herbert Jordan, Bill of Rights Foundation, Rabinowitz, Boudin & Standard, and K. Randlett Walster, New York City, on the brief), for plaintiff-appellee Birnbaum.

Melvin L. Wulf, New York City (Clark, Wulf & Levine, New York City, Burt Neu-

borne, NYU School of Law, New York City, Richard W. Zacks, Providence, R. I., and Joel M. Gora, American Civil Liberties Union Foundation, New York City, of counsel), for plaintiffs-appellees Avery and MacMillen.

Before MOORE, OAKES and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

For twenty years (from approximately 1953 to 1973), the Central Intelligence Agency ("CIA") covertly opened first class mail which American citizens sent to, or received from, the Soviet Union. Letters destined for the U.S.S.R., or originating there, were selected by agents in New York, photocopied, and then returned to postal authorities for ultimate delivery. Selection criteria were employed, but some letters were chosen at random. During the existence of the project over 215,000 pieces of mail were inspected and copied in this fashion.[1]

In 1958, the Federal Bureau of Investigation ("FBI") was informed of the existence of the CIA's East Coast mail project, known by the cryptonyms HTLINGUAL and SRPOINTER, and the CIA offered to share the project's "take" with the FBI. FBI Director Hoover gave his approval, and the FBI provided the CIA with the names and categories of persons or organizations in which it had an "internal security" interest. Such lists were used as additional guides by the CIA in making selections from the United States-Soviet mail that passed

through the CIA check point. D.J. Report at 13. The CIA released photocopies of some letters to the FBI in aid of that agency's mission with respect to suspected domestic subversion.

Norman Birnbaum, Mary Rule MacMillen and B. Leonard Avery, whose mail was opened and copied, separately sued the United States for compensatory damages, invoking the exclusive jurisdiction conferred on the district courts (28 U.S.C. § 1346(b)) under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 ("the Act").[2] In the cases of Birnbaum and MacMillen, the opened letters had been intercepted en route to the U.S.S.R., in 1970 and 1973, respectively. Avery's letter had been opened in 1968, while arriving in the United States from the Soviet Union.[3]

The three cases were consolidated in the District Court for the Eastern District of New York (Hon. Jack B. Weinstein, Judge). Although an advisory jury was empanelled, the District Judge, as required, tried the case himself, 28 U.S.C. § 2402, and found that the United States was liable to each plaintiff individually for damages in the amount of $1,000. The United States was also required to send a letter of apology to each plaintiff.[4] 436 F.Supp. 967, 989–90 (1977). From this judgment the United States appeals.

## I

Before the Act was passed in 1946, the United States, as sovereign, possessed complete immunity against suit for torts com-

---

1. Senate Select Committee to Study Governmental Operations With Respect to Intelligence Activities, Final Report, Book III, at 571 (1976) (Pl.Ex. 11) [hereinafter Senate Report]. General discussion of the history of the CIA's mail opening program may be found at *id.*, at 559–636; Commission on CIA Activities Within the United States, Report to the President (1975) [hereinafter Rockefeller Report]; Department of Justice, Report Concerning Investigation and Prosecutorial Decisions with Respect to Central Intelligence Agency Mail Opening Activities in the United States (A. 179–235) [hereinafter D. J. Report].

2. Their allegations that they have exhausted their administrative remedies, as required un-

der 28 U.S.C. § 2675, are conceded. Birnbaum also asked for the return of all copies of his letters. MacMillen sought to bring a class action.

3. Avery's son, Michael, who sent the letter, sued separately in the District of Connecticut. His claim has withstood a motion to dismiss. *Avery v. United States,* 434 F.Supp. 937 (D.Conn.1977) (Clarie, J.).

4. Plaintiff MacMillen's effort to convert her suit into a class action was denied by Judge Weinstein. 436 F.Supp. at 985–86. That denial was not cross-appealed.

mitted by its agents and employees. *Feres v. United States*, 340 U.S. 135, 139–40, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *see Tempel v. United States*, 248 U.S. 121, 131, 39 S.Ct. 56, 63 L.Ed. 162 (1918); *Hill v. United States*, 149 U.S. 593, 598, 13 S.Ct. 1011, 37 L.Ed. 862 (1893). The only redress was by private bill in the Congress. The purpose of the Act was generally to waive the sovereign immunity of the United States for torts of its employees committed within the scope of their employment, if such torts committed in the employ of a private person would have given rise to liability under state law, 28 U.S.C. § 1346(b). Thus, recovery under the Act could only be predicated upon such a state tort cause of action.[5] Moreover, in groping for a formula that would eliminate the nuisance of private bills and yet interfere only minimally with government functions, Congress created statutory exceptions to the general waiver of immunity in the Act. Three of these are arguably applicable here: (1) 28 U.S.C. § 2680(h), excluding certain specified torts from the ambit of the Act; (2) § 2680(b), exempting from the Act any liability for loss or miscarriage of mail; (3) § 2680(a), creating an exemption from liability for acts done pursuant to a discretionary function. If the claims in suit fall within one of the statutory exceptions, the district court lacks subject matter jurisdiction. *See Myers & Myers, Inc. v. U. S. Postal Service*, 527 F.2d 1252, 1255 (2d Cir. 1975); *Gibson v. United States*, 457 F.2d 1391, 1392 & n. 1 (3d Cir. 1972); *Morris v. United States*, 521 F.2d 872, 874 (9th Cir. 1975).

---

**5.** All parties have stipulated that New York law is to be applied.

**6.** MacMillen and Avery simply alleged that each was "injured . . . under circumstances where the United States, if a private person, would be liable to plaintiff in accordance with the law of the place where the acts occurred." A. 6; *see* A. 174. Birnbaum claims "damage to his privacy, his exclusive property interest in the contents of his mail, and his interests protected by the Fourth Amendment. . . ." A. 17.

## II

The jurisdictional grant of the Act, 28 U.S.C. § 1346(b), gives the District Court exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or *personal injury* or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. (Emphasis added).

The District Court, therefore, had jurisdiction of the subject matter only (1) if there was a "personal injury" as defined by state law,[6] and (2) if the acts causing the "personal injury" would give rise to liability under state law if executed by an employee of a private person.

### A.

#### *Personal Injury*

Although upon the consolidated trial it appeared that no plaintiff was touched physically or harmed financially, and that the sole damage claim was mental suffering, New York recognizes as "personal injury" mental suffering that results from a known category of tort. *Battalla v. State*, 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729 (1961); *Ferrara v. Galluchio*, 5 N.Y.2d 16, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958); *Halio v. Lurie*, 15 A.D.2d 62, 222 N.Y.S.2d 759 (2d Dept. 1961); *see also* N.Y. Gen. Con. Law § 37–a (McKinney).[7]

---

**7.** This provision has been interpreted to include under the rubric of personal injury: mental distress, *Weicker v. Weicker*, 53 Misc.2d 570, 279 N.Y.S.2d 852 (Sup.Ct.), *rev'd on other grounds*, 28 A.D.2d 138, 283 N.Y.S.2d 385 (1st Dept. 1967), *aff'd*, 22 N.Y.2d 8, 290 N.Y.S.2d 732, 237 N.E.2d 876 (1968), invasion of privacy [by appropriation, *see* N.Y.Civ. Rights Law §§ 50, 51 (McKinney)], *Riddle v. MacFadden*, 201 N.Y. 215, 94 N.E. 644 (1911), and, in general, "every variety of injury to a person's body, feelings or reputation." *Bonilla v. Reeves*, 49 Misc.2d 273, 279, 267 N.Y.S.2d 374, 381 (Sup.

## B.

*Basis for Liability Under State Tort Law*

The District Court held in a scholarly opinion that an action in tort would lie in New York alternatively for the following: (1) invasion of the common law right to privacy; (2) injury to common law copyright and property interest in private papers; and (3) direct violation of constitutional right. We review these causes of action under the law of New York *seriatim.*

*Common law right to privacy*

■ The manifold nature of what is loosely termed "the right to privacy" is well established. Both Dean W. Prosser, *The Law of Torts,* § 117 (4th ed. 1971), and the advisers of 3 *Restatement (Second) of Torts* § 652A (1977), agree that the right to privacy comprehends four *distinct* rights, "which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff 'to be let alone.'" Prosser at 804.

The four privacy rights listed in the Restatement are:

 a) unreasonable intrusion upon the seclusion of another . . . . or
 b) appropriation of the other's name or likeness . . . . or
 c) unreasonable publicity given to the other's private life . . . or
 d) publicity that unreasonably places the other in a false light before the public.
 . . .

§ 652A (1977).

These cases all concern infringements of a single right—the right to seclusion free from unreasonable intrusion by another. The activities of the Government in opening and reproducing plaintiffs' mail constituted such an intrusion. As described by the Restatement, violation of the right against intrusion may occur through "opening [one's] private and personal mail . . .." 3 Restatement, *supra,* § 652B, comment b, at 378–79; *cf. LaCrone v. Ohio Bell Tel. Co.,*

114 Ohio App. 299, 182 N.E.2d 15 (1961) (intrusion by eavesdropping).

Appellant United States contends, however, that New York does not recognize a common law right to privacy. Appellant places its reliance principally on the famous 1902 case of *Roberson v. Rochester Folding Box Company,* 171 N.Y. 538, 64 N.E. 442. There, in commenting upon the seminal article by Warren and Brandeis, *The Right to Privacy,* 4 Harv.L.Rev. 193 (1890), a 4 to 3 majority of the New York Court of Appeals observed that "the so-called 'right of privacy' has not as yet found an abiding place in our jurisprudence," 171 N.Y. at 556, 64 N.E. at 447, and denied a remedy for the appropriation and commercial exploitation of the plaintiff's likeness.

Whatever the sweep of some of the language in the case, *Roberson* does not bar a cause of action for *intrusion.* As indicated, the "right to privacy" includes several discrete torts within its ambit, of which appropriation is only one. As Holmes observed, "[w]e do not get a new and single principle by simply giving a single name to all the cases to be accounted for," *The Common Law* at 204 (1945 ed.). That the *Roberson* court rejected a privacy right in the context of an appropriation does not imply a rejection of a remedy for intrusion.

Moreover, the court in *Roberson* rested its decision on the lack of precedent in English law for enjoining the appropriation and publication of a photograph which did not actually defame the plaintiff or injure her reputation. The court was not asked to consider the right to be secure in one's papers as the foundation for an actionable wrong. Had there been occasion to address the intrusion question, the court might well have upheld a cause of action because, unlike appropriation, intrusion had been previously acknowledged as a species of tort.

Such a right had been recognized before the American Revolution. In *Entick v. Carrington,* 95 Eng.Rep. 807, 19 How.St.Tr. 1029 (C.P.1765), the British Secretary of

Ct.1966); *accord, Rolnick v. Rolnick,* 55 Misc.2d 243, 284 N.Y.S.2d 908 (Sup.Ct.1967); *rev'd on other grounds,* 29 A.D.2d 987, 290

N.Y.S.2d 111 (2d Dept. 1968), *aff'd,* 24 N.Y.2d 805, 300 N.Y.S.2d 586, 248 N.E.2d 442 (1969).

State issued a non-judicial search warrant to procure evidence of seditious libel. His messengers entered the plaintiff's house under the authority of the purported warrant and seized and perused private papers. Though the action was technically a trespass to the home, Lord Camden read the protections of privacy more broadly. The court commented:

> [W]e can safely say there is no law in this country to justify the defendants in what they have done; if there was, it would destroy all the comforts of society; for papers are often the dearest property a man can have.

95 Eng.Rep. at 817–18.

By 1902 there were actual cases in New York in which damages had been awarded for intrusions upon privacy that were the consequence of other torts. In *Moore v. New York Elev. R. Co.*, 130 N.Y. 523, 29 N.E. 997 (1892), the Court of Appeals reviewed an action brought for impairment of certain easements of a homeowner by the construction of an elevated railway. The court allowed an award of damages for the reduction in the value of the property due to the fact that the public travelling on the elevated trains could view the interiors of certain rooms. And an earlier New York Common Pleas case had granted damages for invasion of privacy by intrusion suffered in the course of an unlawful repossession of chattels from a home. *Ives v. Humphreys*, 1 E. D. Smith 196 (1851).[8]

When *Roberson* was decided, then, authority was not lacking that freedom from intrusion was at least derivatively protected. More recently, the broad right to privacy has secured the general recognition which the *Roberson* court thought was lacking with respect to the limited tort of appropriation. In the nineteen-thirties "the tide set in strongly in favor of recognition" of the tort of invasion of privacy and it was accepted in most jurisdictions. Prosser, at 804; *see* Note, *The Right to Privacy Today*, 43 Harv.L.Rev. 297 (1929) (by the writer); Feinberg, *Recent Developments in the Law of Privacy*, 48 Col.L.Rev. 713 (1948) (the author now sits on this court); 1 F. Harper & F. James, *Law of Torts*, § 9.6 at 682–83 (1956).[9]

Intrusion upon the person has, in more recent times, been held to be a violation of the Federal Bill of Rights, extending the early recognition that opening mail without warrant is a violation of the Fourth Amendment. *Ex parte Jackson*, 96 U.S. 727, 24 L.Ed. 877 (1878). Nothing could be more revealing of the spirit of the times, for the Constitution does not, of course, say a single word about privacy. *Compare Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (conceptualizing Fourth Amendment in terms of privacy) and Justice Brandeis dissenting in *Olmstead v. United States*, 277 U.S. 438, 478–79, 48

---

**8.** In *Moore, supra*, the New York court was following the holding of the House of Lords in *Duke of Buccleuch v. Metropolitan Bd. of Works*, L.R. 5 E. & I. App. 418 (1872), sustaining damages, *inter alia*, for loss of seclusion when property abutting a home was taken and converted into a public highway. *Moore* and *Ives* were not overruled in the *Roberson* opinion and would still appear to be valid precedent. To be sure, there are statements to the effect that the only right of privacy recognized in New York is statutory. *See, e. g., Flores v. Mosler Safe Co.*, 7 N.Y.2d 276, 280, 196 N.Y. S.2d 975, 977, 164 N.E.2d 853, 854 (1959); *Gautier v. American Broadcasting Co., Inc.*, 304 N.Y. 354, 358, 107 N.E.2d 485, 487 (1952); *Kimmerle v. New York Evening Journal*, 262 N.Y. 99, 102, 186 N.E. 217, 217–18 (1933); *Wojtowicz v. Delacorte Press*, 58 A.D.2d 45, 47, 395 N.Y.S.2d 205, 206 (1st Dept. 1977), *aff'd*, 43 N.Y.2d 858, 403 N.Y.S.2d 218, 374 N.E.2d 129 (1978). But none of these cases involved intru-

sions, as opposed to other sorts of infringements upon privacy. *Compare Wojtowicz, supra*, at 860, 403 N.Y.S.2d at 219, 374 N.E.2d at 130 (as yet no New York recognition of common law "right to judicial relief for invasion of privacy *in consequence of unreasonable publicity* . . . .." [emphasis added]).

**9.** Most states and the District of Columbia recognize invasions of privacy as actionable torts. Prosser, *supra*, § 117 at 804, 1 F. Harper & F. James, *Law of Torts, supra*, at 682–83; *see, e. g., Pearson v. Dodd*, 133 U.S.App.D.C. 279, 410 F.2d 701, *cert. denied*, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969) (recognizing tort of intrusion in general); *LaCrone v. Ohio Bell Tel. Co., supra* (Ohio App.) (intrusion by wiretapping); *Sutherland v. Kroger Co.*, 144 W.Va. 673, 110 S.E.2d 716 (1959) (intrusion by search of shopping bag).

S.Ct. 564, 72 L.Ed. 944 (1928). Justice Frankfurter in *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), while refusing to apply the exclusionary rule of *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), to the states, announced that "[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society." *Id.* 338 U.S. at 27, 69 S.Ct. at 1361. The proscription against such intrusions has been applied in numerous constitutional contexts. *See, e. g., Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (use of stomach pump to extract evidence violates Fourteenth Amendment); *NAACP v. Alabama*, 357 U.S. 449, 466, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (right to pursue "lawful private interests privately"); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (marital privacy); *Katz v. United States, supra* (privacy in conversation).

In the light of the current jurisprudence, it is hard to believe that the New York Court of Appeals today would apply the rationale of the 1902 *Roberson* decision to bar an action based on intrusion upon privacy.[10] In sharp contrast to the reluctance of the 1902 court to advance the common law, a more contemporary New York Court of Appeals has said, in another context:

> The sum of the argument against plaintiff here is that there is no New York decision in which such a claim has been enforced. . . . [but] "if that were a valid objection, the common law

would now be what it was in the Plantagenet period." [citation omitted]

. . . We act in the finest common-law tradition when we adapt and alter decisional law to produce common-sense justice.

. . . Legislative action there could, of course, be, but we abdicate our own function, in a field peculiarly non-statutory, when we refuse to reconsider an old and unsatisfactory court-made rule.

*Woods v. Lancet*, 303 N.Y. 349, 355, 102 N.E.2d 691, 694 (1951).[11]

A recognition of a right to privacy against intrusion is supported in New York, moreover, by current legislative policy, couched though it is in terms of the criminal sanction. New York Penal Law Article 250 (Right to Privacy) § 250.25(1) provides that a person is guilty of tampering with private communications when "[k]nowing that he does not have the consent of the sender or receiver, he opens or reads a sealed letter . . . ." We do not force the implication of a remedy in money damages from the criminal sanction, for that would go beyond our function in finding New York law. *Cf. Cort v. Ash*, 422 U.S. 66, 78–80, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). We think, however, that in gathering the strands of policy which affect our prophecy, intrusion into private papers is now beyond the limit of civil as well as penal indulgence.[12]

Mindful that our role under the Federal Tort Claims Act is to ascertain state law, rather than to depart from it, we are also

---

**10.** In the three-quarters of a century since *Roberson*, the particular type of privacy invasion that was denied a remedy in that case—appropriation and commercial exploitation of a person's name or photograph—has itself gained statutory protection. 1903 N.Y. Laws, c. 132, §§ 1, 2 [current version at N.Y.Civ. Rights Law §§ 50, 51 (McKinney)].

**11.** The modern New York Court of Appeals has responded in the past to new trends in jurisprudence by altering or developing decisional law. *See, e. g., Dole v. Dow Chem. Co.*, 30 N.Y.2d 143, 148–51, 331 N.Y.S.2d 382, 386–90, 282 N.E.2d 288, 291–94 (1972); *Babcock v. Jackson*, 12 N.Y.2d 473, 477–82, 240 N.Y.S.2d 743,

746–50, 191 N.E.2d 279, 281–84 (1963); *Battalla v. State, supra*, 10 N.Y.2d at 239–40, 219 N.Y.S.2d at 35–37, 176 N.E.2d at 730–31; *Woods v. Lancet, supra*, 303 N.Y. at 351–56, 102 N.E.2d at 692–95.

**12.** We note in particular the manner in which the New York Court of Appeals has referred in dictum to a companion provision of the Penal Law—§ 250.05 (against eavesdropping)—in the course of an opinion in which it upheld a cause of action against intrusion under the law of the District of Columbia. *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 570 n. 3, 307 N.Y.S.2d 647, 655 n. 3, 255 N.E.2d 765, 771 n. 3 (1970).

aware that "[l]aw does change with times and circumstances, and not merely through legislative reforms." *Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 209, 76 S.Ct. 273, 279–80, 100 L.Ed. 199 (1956) (Frankfurter, J., concurring); *see Battalla v. State, supra.* A refusal to accept a perceptible trend may be as much a failure to follow state law as a refusal to apply existing precedent because it is somewhat ambiguous. Our reading of past cases and our assessment of current legal thinking lead us to the judgment that the New York Court of Appeals would recognize an action for violation of the right to be free from unreasonable intrusion.[13] We agree with the District Court that there is a claim for relief in New York against a private person for intrusion upon the privacy of another, and that such a claim includes the opening and reading of sealed mail.[14]

## Common Law Copyright and Property Interest in Private Papers

█ The District Court has written a scholarly thesis supporting the view that the reading of private mail was a violation of a common law copyright of the correspondents under New York law. 436 F.Supp. at 978–83. Judge Weinstein concedes that the New York courts have not had a case directly in point. We do not doubt that the New York courts accept the English doctrine of *Gee v. Pritchard*, 36 Eng.Rep. 670 (Ch. 1818) that private letters, even if of no literary value, are protected by common law copyright. *Woolsey v. Judd*, 11 Super. (4 Duer) 379 (N.Y.1855); *see Folsom v. Marsh*, 9 Fed.Cas. No. 4,901, p. 342 (C.C.D.Mass.1841) (*per* Story, J.). But the common law copyright is, in essence, a right of first publication, 1 *Nimmer on Copyright* §§ 4.02, 4.03 & 4.07 (1978); *Estate of Hemingway v. Random House*, 53 Misc.2d 462, 464, 279 N.Y.S.2d 51, 54–55 (Sup.Ct.), *aff'd by order,* 29 A.D.2d 633, 285 N.Y.S.2d 568 (1st Dept.1967), *aff'd on other grounds,* 23 N.Y.2d 341, 296 N.Y.S.2d 771, 244 N.E.2d 250 (1968), which of necessity includes the right to suppress any publication by injunction.[15] Hence, although one

---

**13.** In *Galella v. Onassis*, 487 F.2d 986, 995 n. 12 (2d Cir. 1973), we said:

> Although the New York courts have not yet recognized a common law right of privacy, if we were required to reach the question, we would be inclined to agree with the court below that when again faced with the issue the Court of Appeals may well modify or distinguish its 1902 holding in *Roberson v. Rochester Folding-Box Co.*, 171 N.Y. 538, 64 N.E. 442 (1902), that "The so-called right of privacy has not as yet found an abiding place in our jurisprudence." There is substantive support today for the proposition that privacy is a "basic right" entitled to legal protection, *Time v. Hill*, 385 U.S. 374, 415, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (Fortas, J., dissenting) . . . . There is an emerging recognition of privacy as a distinct, constitutionally protected right. *Roe v. Ingraham*, 480 F.2d 102 (2d Cir. 1973), (Friendly, J.).

**14.** Nor is it fruitful to consider the analogous common law tort of trespass to chattels as a ground of action here. The surreptitious opening and reproduction of the letters without appropriating or physically damaging them does not fit easily under the rubric of trespass to chattels. That cause of action requires, either a dispossession of, or restraint on, the chattel, *Wintringham v. Lafoy*, 7 Cow. 735 (N.Y.Sup.Ct. 1827); *Hanmer v. Wilsey*, 17 Wend. 91 (N.Y. Sup.Ct.1837), or its impairment by intermeddling, *Socony-Vacuum Oil Co. v. Bailey*, 202 Misc. 364, 109 N.Y.S.2d 799 (Sup.Ct.1952); 1 *Restatement (Second) of Torts*, § 218(b) and Reporter's Note e; *accord*, Prosser, *supra*, at 77. Intermeddling is actionable only where the chattel has been "impaired as to its condition, quality or [material] value. . . ." *Restatement, id.; contra* F. Pollock, *Law of Torts* 354 (12th ed. 1923). There was no dispossession or impairment here. Moreover, to the extent that *Entick v. Carrington, supra*, tends to support an action in trespass here, it also, as we have seen, implies an action that can be defined as intrusion upon privacy. Since the demise of the forms of action, we need not look further for state tort law than to the right of privacy which we have described. As the Supreme Court said in *Warden v. Hayden*, 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967):

> We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts [citing cases].

This applies as well to the non-constitutional torts of privacy.

**15.** The preemption of state common law of copyright by the 1976 copyright law revision, 17 U.S.C. § 301(a), is not relevant to any common law copyright cause of action in this case, since under the new law preemption does not apply to causes of action arising before 1978. *Id.* § 301(b)(2).

may enjoin the publication of letters to effectuate their suppression, the damage remedy (defamation aside) would lie only if there were a spoliation of the right to a first publication which actually destroyed the value of the owner's right to seek a statutory copyright. *See Szekely v. Eagle Lion Films*, 140 F.Supp. 843, 849 (S.D.N.Y. 1956), *aff'd*, 242 F.2d 266 (2d Cir.), *cert. denied*, 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed.2d 1437 (1957). Since the owner of the letter did not consent to its publication, he did not lose his right to first publication. *See* Nimmer, § 4.03. And the mere copying and limited distribution of the letter did not constitute a distribution to the public that could cause damage to the value of the owner's continuing right to secure a statutory copyright. *See Estate of Hemingway*, *supra*, 53 Misc.2d at 464–65, 279 N.Y.S.2d at 55. We would find it strained, in any event, to say that the reading of the plaintiffs' letters by several persons, none of whom circulated them to the world, is a "publication" that destroys the value of the work in question. *See* 2 Nimmer § 8.23; *cf. Universal Copyright Convention*, art. VI (Paris 1971) (publication defined as "general distribution"); *Berne Convention* (Brussels 1948), art. 4(4) (publication involves making works available in "sufficient quantities"); *see also Berne Convention* (Paris 1971), art. 3(3).[16] Hence, we do not find the tort of infringement of common law copyright applicable in the instant case.

*Violation of Constitutional Rights as Tortious Conduct*

 The District Court also held that the violation of plaintiffs' federal constitu-

tional rights is a separate ground for liability under state law.[17] We do not believe that the Federal Tort Claims Act comprehends *federal constitutional* torts in its reference to the "law of the place" under § 1346(b). As described in the House Judiciary Committee Report dealing with the Act's direct predecessor bill, *see Dalehite v. United States*, 346 U.S. 15, 26, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the applicable rules of substantive decision, except where otherwise specified, were to be drawn from "local law." H.Rep.2245, 77th Cong., 2d Sess., at 9 (1942). Attention was focused on everyday torts, particularly the sort of negligence of which automobile drivers are guilty. Even though federal law is supreme in the state courts, U.S.Const., art. VI; *Testa v. Katt*, 330 U.S. 386, 391, 67 S.Ct. 810, 91 L.Ed. 967 (1947); *General Oil Co. v. Crain*, 209 U.S. 211, 226–28, 28 S.Ct. 475, 52 L.Ed. 754 (1908), one does not think of the specific terminology of "local law" except to describe a system different from federal law. In the absence of any indication that Congress conceived of "local law" under the Act as comprehending federal constitutional torts—only a glimmer until *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946)—we are not prepared to adopt so unusually broad a reading of the "law of the place" requirement. Moreover, by adopting the "law of the place" as the source for rules of decision under the Federal Tort Claims Act, Congress expressly negated any possible inference that federal courts were to exercise any "common lawmaking" power to fashion torts under the

---

**16.** That limited viewing does not constitute the sort of publication that transgresses an owner's common law copyright was implicitly recognized in the famous case of *Baker v. Libbie*, 210 Mass. 599, 97 N.E. 109 (1912). There, Chief Justice Rugg distinguished between the right of an author of a letter and the right of the holder of the physical letter by treating the former as a copyright in the ideas and expression and the latter as a proprietary right in the physical material. The Massachusetts court then went on to hold that the author's copyright would permit restraint of "publication . . . in the sense of making public through printing or multiplication of copies," but not the right to

prevent a transfer of the letter itself. *Id.* at 607, 97 N.E. at 112. Thus, the court appeared to treat the copyright as uninfringed by a limited transfer (and, presumably, perusal).

**17.** This ruling becomes significant only if it is held that violation of the right to privacy as a tort does not exist under New York law. Upon that alternative assumption, however, we must address the question. Moreover, as we shall see later, the right of action against the United States does not depend upon a *constitutional* violation by the CIA, but rather upon the commission of acts which were beyond the delegated functions of the Agency.

Act in the interest of national uniformity.[18] *Compare Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957).

Since Congress restricted the basis for liability under the Act to the "law of the place," we think that it would be a *tour de force* to consider direct violations of the federal constitution as "local law" torts. Such a rule might be tantamount to a by-pass of the sovereign immunity of the United States without the consent of Congress. We hold, accordingly, that the claim for relief may not be sustained on that basis.

### III

Having found that each of the plaintiffs suffered a personal injury as a result of an intrusion upon privacy by the Government that would give rise to a private law tort under the law of New York, we determine that the initial jurisdictional requirement of 28 U.S.C. § 1346(b) has been met.

We must now consider whether the Government may claim an exception from liability under the provisions of 28 U.S.C. § 2680. We will focus upon three exceptions: (1) § 2680(h), for certain specified torts; (2) § 2680(b), for miscarriage of mail; and (3) § 2680(a), for discretionary functions.

### A. *§ 2680(h)*

■ Under this subsection of the Federal Tort Claims Act, there is an exception for:

Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process,

libel, slander, misrepresentation, deceit, or interference with contract rights. . .

Although this exception might be construed as excepting all intentional torts, the Government does not urge that reading upon us. In any event, the jurisdictional statute, 28 U.S.C. § 1346(b), covers "wrongful" as well as negligent acts. *See Hatahley v. United States*, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956); *Dalehite v. United States, supra*, 346 U.S. at 45, 73 S.Ct. at 972–73 (dictum). Thus, it has been held that the torts of trespass and invasion of privacy do not fall within the exception of § 2680(h). *See Hatahley, supra* (trespass); *Black v. Sheraton Corp. of America*, 184 U.S.App.D.C. 46, 54–56, 564 F.2d 531, 539–41 (1977) (invasion of privacy).[19]

### B. *§ 2680(b): The Postal Exception*

■ We turn next to the postal exception, which also requires little discussion. The exception relates to "[a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter."

The language of the exception itself indicates that it was not aimed to encompass intentional acts. Had Congress intended to bring *intentional* disturbance of the integrity of a letter within the postal exception, it would not have used the term "negligent transmission." Nor were the letters lost or miscarried. "Miscarriage" in the context of mail means misdelivery.

We hold, therefore, that the postal exception does not apply to save the United States from liability in these cases.[20]

---

**18.** The cases on appeal arose before the 1973 Amendments to the Act, so we need not consider any effect the Amendments should be deemed to have. Boger, Gitenstein & Verkuil, *The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis*, 54 N.C.L.Rev. 497, 520–21 (1976).

**19.** When the Act was amended in 1973, this was assumed. *See* S.Rep.No.588, 93d Cong., 1st Sess. 3 (1973).

**20.** Our decision in *Marine Ins. Co. v. United States*, 378 F.2d 812 (2d Cir.), *cert. denied*, 389

U.S. 953, 88 S.Ct. 335, 19 L.Ed.2d 361 (1967) is not to the contrary. *Marine Insurance* held that where customs agents had temporarily *removed* and treated a mailed package of emeralds with a fluorescent powder to detect a thief, the subsequent loss of the package by *postal authorities* fell within the postal exception. The claim in *Marine Insurance* was not for redress because of the temporary removal and treatment of the package, but for its subsequent "loss" from the postal system, which would have occurred even if the interception had not taken place. 378 F.2d at 815.

C. *§ 2680(a):* *"Discretionary Function"* *Exception*

Finally, we turn to consider whether the Government's mail opening project is removed from the scope of the Federal Tort Claims Act by § 2680(a), which provides an exception for:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

This is not a case where Congress has passed a mail-opening statute that is being challenged as unconstitutional. It is common ground that there is no statute or regulation which sanctions the mail opening procedure engaged in by the CIA. Our inquiry relates therefore only to whether the CIA personnel were engaging in a "discretionary function," rather than executing a policy required by "statute or regulation." The "discretionary function" exception is distinct from the exception based upon a statute or regulation. *See Dalehite v. United States, supra,* 346 U.S. at 32–34, 73 S.Ct. at 966–67.

█ We state our conclusions in summary form. We hold: (1) that a discretionary function can only be one within the scope of authority of an agency or an official, as delegated by statute, regulation, or jurisdictional grant; (2) that the CIA's legislative charter gave the Agency no authority to gather intelligence on domestic matters; (3) that the Agency's partnership with the FBI in the mail opening project led it to transgress the limitations of its charter; and (4) that there was no "discretion" to engage in these mail opening activities, so that the discretionary function exception does not apply. Hence, we do not reach the question

whether a *properly* delegated but unconstitutional activity would come within the "discretionary function" exception. Nor do we reach the question posed by the Government: whether Congress intended to allow actions to be brought under the Act which challenge discretionary acts as unconstitutional. We note that, of course, such acts or omissions alleged to be unconstitutional—for example, violations of procedural due process—would support liability under the Act *only* if they constituted independent torts under state law. It would be an unusual situation when such a concatenation of wrongs would occur. *But cf. Myers & Myers, Inc. v. U. S. Postal Service, supra,* at 1260 & n.8.

1.

A discretionary function can derive only from properly delegated authority. Authority generally stems from a statute or regulation, or at least, from a jurisdictional grant that brings the discretionary function within the competence of the agency. Discretion may be as elastic as a rubber-band, but it, too, has a breaking point. An act that is clearly outside the authority delegated cannot be considered as an "abuse of discretion." *See Hatahley v. United States, supra; Myers & Myers, Inc. v. U. S. Postal Service, supra,* at 1261 (no discretion to violate regulations); *Griffin v. United States,* 500 F.2d 1059, 1068 (3d Cir. 1974) (same); *United Air Lines v. Wiener,* 335 F.2d 379, 393–94 (9th Cir.) (same), *cert. dismissed,* 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964).[21]

In *Hatahley v. United States,* horses belonging to Indians were rounded up on the public range and sent to slaughter by federal agents on the ground that they were "abandoned" horses under a Utah statute which permitted such horses to be eliminated. Under the Utah statute, no notice was required. The Federal Range Code, however, required that written notice, together with an order to remove livestock from the

---

**21.** By way of contrast, in *Kiiskila v. United States,* 466 F.2d 626 (7th Cir. 1972), a decision was treated as discretionary because the applicable regulation was interpreted as reserving to the decisionmaker broad discretion, including "the authority to grant exceptions." *Id.* at 628.

public range, be served on the alleged violator as a precondition to impounding the animals. The federal range manager made a policy decision to prosecute a vigorous campaign to destroy the Indians' horses. This campaign went on for several years. 351 U.S. at 176, 76 S.Ct. at 749. The range manager apparently determined that under the Utah statute he was not required to give the notice mandated by the Federal Range Code.

The Supreme Court held that "both the written notice and failure to comply [therewith] are express conditions precedent to the employment of local procedures" under the Range Code, and that federal agents "are required to follow the procedures there established." *Id.* at 178, 76 S.Ct. at 750. The United States was held liable for "the willful torts" of its employees, since 28 U.S.C. § 1346(b) provides for liability for "wrongful" acts such as trespass. *Id.* at 180–81, 76 S.Ct. at 751.

The Court then considered the exception in 28 U.S.C. § 2680(a). It held that the agents had not exercised the "due care" required by the exception, noting that " '[d]ue care' implies at least some minimal concern for the rights of others." The Court disposed of the contention that the "discretionary function" exception applied to these acts *beyond the scope of regulations* by declaring that "[t]hese acts were wrongful trespasses not involving discretion on the part of the agents . . ." *Id.* at 181, 76 S.Ct. at 752.

*Hatahley* is significant authority in several respects. First, it had never been decided before *Hatahley* that notice was required under the Federal Code when the agents were engaged in enforcing the Utah statute. In fact, even the Court of Appeals had held below that no such notice was required. 220 F.2d 666 (10th Cir. 1955). Second, the agents were engaged in a policy promulgated by the range manager and in force for several years. Yet the Court held that because the notice required by the regulation was not given, the policy judgment in question was without authority and therefore did not concern "any problem of a

'discretionary function' under the Act [citation omitted]." 351 U.S. at 181, 76 S.Ct. at 752.

The *Hatahley* analysis is strikingly relevant to the case at bar; the CIA's mail opening project could not have been a "discretionary act" if the Agency lacked authority to conduct such a program. We must, therefore, determine the scope of the Agency's legally delegated competence.

### 2.

█ The Central Intelligence Agency was the grandchild of the Office of Strategic Services ("OSS"), which conducted the United States' successful intelligence and special operations campaigns during the Second World War. As the war drew to a close, General William J. Donovan, head of the OSS, recommended to President Roosevelt that a central authority be formed to obtain intelligence from abroad and to determine national intelligence goals. It was proposed that this agency would coordinate the intelligence activities of other departments, such as the military services, but that the new central intelligence authority would have " 'no police or law enforcement functions, either at home or abroad.' " Rockefeller Report at 46.

After some debate within the Executive Branch, President Truman issued a directive creating the Central Intelligence Group, early in 1946. The Presidential Directive was explicit in limiting the Group's role to foreign intelligence gathering. It declared that "[n]o police, law enforcement or internal security functions shall be exercised . . .." and that

> [n]othing herein shall be construed to authorize the making of investigations inside the continental limits of the United States and its possessions, except as provided by law and Presidential directives.

Presidential Directive, Coordination of Federal Foreign Intelligence Activities, F.R. Doc. 46–1951 (Feb. 1, 1946); *see* Rockefeller Report at 51.

The Central Intelligence Agency was chartered by Legislative enactment in 1947. The scope of its authority and the limita-

tions thereon were patterned upon General Donovan's recommendations and the experience of the Central Intelligence Group. Critical provisions of this legislative charter, contained in the National Security Act of 1947, Pub.L.No.253 § 102(d) & (e), 61 Stat. 497, *codified* at 50 U.S.C. § 403(d) & (e), placed the Agency under the supervision of the National Security Council and directed the Agency to

> correlate and evaluate intelligence relating to the national security, and [to] provide for the appropriate dissemination of such intelligence within the Government
> . . ..

§ 102(d)(3). It also provided specifically "[t]hat the Agency shall have no police, subpena, law-enforcement powers, or internal-security functions."

The meaning of these provisions is clarified by reference to their legislative history. Members of Congress were concerned that failure precisely to spell out the new Agency's limitations in the National Security Act might permit the Agency to expand its activities into internal security matters. *See Hearings on H.R.2319 Before the House Comm. on Expenditures in the Executive Dept.,* 80th Cong., 1st Sess., at 126–28, 170–75, 437–39, 479–81 (1947).[22] Congress responded to this issue by amending the proposed Act to define the duties of the Agency and, specifically, to restrain any entry by the CIA into "internal security" matters. H.Rep.No.961, 80th Cong., 1st Sess. 3–4 (1947); National Security Act, *supra,* § 102(d).

Furthermore, National Security Council Intelligence Directives, designed to guide the CIA, permitted so-called "overt" collection of foreign intelligence within the United States (*i. e.,* collection with the knowing and voluntary cooperation of sources) but not "clandestine" collection in the United States (*i. e.,* collection without the source's awareness). Rockefeller Report at 55.

Thus, all parties involved in drafting and passing the legislation stated expressly at times, and indicated implicitly throughout, that the CIA was not to become concerned with developing intelligence as to domestic or internal security matters, except "for protecting intelligence sources and methods from unauthorized disclosure." § 102(d)(3), 50 U.S.C. § 403(d)(3). The subject matter of the Agency's interest was to be foreign activity, not activity at home,[23] and the Agency was not to have any "internal security functions." § 102(d)(3), 50 U.S.C. § 403(d)(3).

As noted, from 1958 on, the CIA began to examine intercepted mail not only to satisfy its own need for intelligence about the U.S. S.R., but to satisfy as well the FBI's requirements for counterespionage information and data on "peace organizations, anti-war leaders, black activists, and women's groups." Senate Report at 624.[24] By the mid-sixties, then, the CIA had undertaken an operation that involved broad and indiscriminate inspection of private mail with a view to obtaining information on matters of domestic, as well as foreign, concern.

There was no room in the charter for a "policy judgment" that the CIA should in-

---

**22.** Legislators wanted

to make certain that the activities and the functions of the Central Intelligence Agency were carefully confined to international matters, to military matters, and to matters of national security. We have enough people now running around butting into everybody else's business in this country without establishing another agency to do so.

\* \* \* \* \* \*

I do not think it would be the Central Intelligence Agency's right, authority, or responsibility to check on the ordinary domestic activities of the average American citizen.

. . .

*Hearings* at 438–39 (Rep. Brown).

**23.** Under § 102(e) of the National Security Act, 50 U.S.C. § 403(e), the Director of the CIA may obtain by written request from the FBI such information as may be essential to national security. But there is no correlative mandate to assist the FBI's domestic operations in a covert manner.

**24.** An FBI internal memorandum of 1966 illustrates the sorts of information garnered by the CIA's mail openings: intelligence "regarding persons involved in the peace movements, anti-Vietnam demonstrations, women's organizations, 'teach-ins' . . ., racial matters. . . ." Senate Report at 633 & n.336.

volve itself in gathering secret data on domestic problems. Indeed the CIA knew this as well as anyone. An Agency internal memorandum admitted that "there is no legal basis for monitoring postal communications in the United States except during time of war or national emergency . . ." [25]

We find, therefore, that the CIA was acting so far beyond its authority that it could not have been exercising a function which could in any proper sense be called "discretionary." [26] *See Hatahley, supra.*

### 3.

Though we hold that these activities of the CIA were beyond the realm of discretion, we cannot share entirely the *moral* concern of the District Court over these activities, for the security of the nation was said to be involved. We assume that the CIA officials meant well by their country. Even testimony before the Senate Committee by a principal CIA official, stating that he knew that the mail opening was illegal but thought it in the national interest, Senate Report at 605, gives us no cause for a homily. As the Attorney General reported:

> The issue involved in these past programs, in the Department's view, relates less to personal guilt than to official government practices that extended over

two decades. In a very real sense, this case [mail opening] involves a general failure of the government, including the Department of Justice itself, over the period of the mail opening programs, ever clearly to address and to resolve for its own internal regulation the constitutional and legal restrictions. . . .

D.J. Report at 5. It appears to us that it would be hypocritical for judges now to assess the activity in terms of moral censure.

### 4.

Nevertheless, while, as federal agents, the CIA personnel may still have an absolute immunity from *state* suits, *Butz v. Economou,* —— U.S. ——, —— & n.22, 98 S.Ct. 2894, 2905 & n.22, 57 L.Ed.2d 895 (1978); *Granger v. Marek,* 583 F.2d 781 (6th Cir. 1978); *see Howard v. Lyons,* 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959), the CIA agents' qualified immunity in federal constitutional suits arising out of this set of circumstances, *see Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), may well not protect them if it be found that their mail openings were "unconstitutional action on a massive scale." *Economou,* —— U.S. at ——, 98 S.Ct. at 2910.

25. *Quoted* in Rockefeller Report at 108.

26. The only possibly arguable escape from this compelling conclusion might be if it could be established that the President had actually authorized the mail openings under his Article II power to conduct foreign affairs. *See United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); *cf. United States v. United States District Court,* 407 U.S. 297, 308–09, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) *(Keith)* (leaving open the question whether the Fourth Amendment warrant requirements applies to the President's surveillance power respecting "the activities of foreign powers" or their agents). Of course, these cases do not in any way imply that the President may ignore a specific limitation placed by Congress on the powers of an agency it has created by statute. But, in any event, it has been demonstrated above that these particular mail opening activities were not directed against "activities of foreign powers" or their agents. And we have learned that the President has no special constitutional power in

matters involving domestic intelligence. *Keith, supra; compare Youngstown Sheet & Tube v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

There is, moreover, an absence of proof upon this record that the CIA was acting under direct presidential authority. *See generally,* Senate Report at 594–99. The untimely death of Allen Dulles, long time Director of the CIA, and the deaths of several successive presidents make such proof unavailable. President Nixon, the sole surviving President from this period, does not recollect being told about the mail openings. Senate Report at 597–98. Nor would speculation about what our presidents knew or did not know be fruitful or in the public interest. Though courts might feel compelled to delve further into that matter if an agent's feet were being held to the fire in a criminal case, there is no such compulsion in an action against the United States for money damages.

Since a judgment in an action against the United States under the FTCA will constitute a judgment in bar in favor of the employee whose act gave rise to the claim, 28 U.S.C. § 2676, it is likely, however, that claims for torts would be made against the United States rather than, as *Bivens* suits, against the employee.

That is as it should be. The CIA agent who, in other days, might have been a candidate for a citation of merit, should not now be made to suffer alone an ignominious financial ruin. The term "discretionary function", left obscure by Congress, permits a judicial interpretation which achieves substantial justice without chilling governmental action any more than an erosion of the absolute immunity of Government officials has been thought to chill such action. *Compare Economou, supra,* with *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir. 1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

The responsibility is lodged, under the FTCA, where the careful report of the Attorney General says it belongs—on a diverse and complacent officialdom. Compensation for incidental harm resulting from the Government's pursuit of its security interests is more justly borne by the entire body politic than by agents of the Government, who, out of patriotic zeal, exceeded the outer limits of their delegated authority. So long enduring and pervasive a breach of privacy, in the face of an utter lack of authority, is fittingly a responsibility the United States should assume to compensate the plaintiffs.

This approach to the discretionary function provision, moreover, is congruent with developments in the interpretation of constitutional and statutory law that have increasingly extended state and municipal liability for civil rights violations that are analogous to the privacy tort involved in the instant case. *Compare Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), *and Monell v. Department of Social Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

We hold that the exception in § 2680(a) is no bar to recovery against the United States.

IV

■ Having determined that the United States is liable to these plaintiffs for harm caused by mail openings, we must review the District Court's award of $1000 in compensatory damages and of an apology to each plaintiff.

Although damages under the Act are governed by state law, *Hatahley, supra,* 351 U.S. at 182, 76 S.Ct. at 752, the Act limits recovery to compensatory damages and provides that the United States shall not be liable for punitive damages, 28 U.S.C. § 2674. In New York, as we have seen, freedom from mental disturbance is a protected interest, but there must be a " 'guarantee of genuineness in the circumstances of the case.' " *Ferrara v. Galluchio, supra,* 5 N.Y.2d at 21, 176 N.Y.S.2d at 999–1000, 152 N.E.2d at 252 (quoting Prosser).[27] The question is whether the testimony of the plaintiffs sustains a finding of mental anguish under New York law, in which event the judgment for $1,000 each would not be excessive, or whether there was no actual damage, in which case only nominal damages of one dollar would have been proper. *Cf. Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (construing § 1983).[28]

The answer is not easy. There was no finding of physical injury and no loss of employment. There also was no mental injury in the sense of "permanent symptoms of anxiety." *Ferrara, supra.*

**27.** The Court of Appeals in *Ferrara* permitted recovery in a case in which "permanent symptoms of anxiety" were present, noting that "[i]t is self-evident that every case must be decided according to the facts peculiar to it." *Id.* at 22, 176 N.Y.S.2d at 1000, 152 N.E.2d at 253.

**28.** Since cases have not arisen in New York in which there has been a judgment in damages for the tort of intrusion upon privacy, there is no direct precedent available, as Judge Weinstein observed.

The question whether a finding of mental anguish is sustainable is further complicated by two unusual features of these cases. First, the plaintiffs deliberately sought to find out under the Freedom of Information Act whether their mail had been tampered with. In direct response to their curiosity, they received the information which resulted in the purported injury. Thus, in a strict sense, "but for" the plaintiffs' acts in uncovering the openings, they might never have been made to suffer anguish over the Government's wrongs. Second, the letters interfered with were being transported to or from the Soviet Union, a closed society in which, as most people are aware, mail may be opened by secret police without "constitutional" restraint. Only the naive would be emotionally unprepared for the possibility that a letter might be opened in the Soviet Union. Under those circumstances, it is somewhat difficult to credit the proposition that a reasonable person would be shocked by the mere fact that a letter going to or coming from the U.S.S.R. had been opened *at some point.*

Although, in a sense, the plaintiffs brought their feelings of outrage upon themselves by seeking information, we do not believe, upon reflection, that this is a meaningful break in the chain of causation that links the mail openings to any anguish suffered. The mail opening was an intentional tort and it may be deemed to have been foreseeable that anguish might ensue if there were discovery. *See Derosier v. New England Tel. & Tel. Co.*, 81 N.H. 451, 130 A. 145 (1925); Prosser, *supra*, at 263.[29]

More troublesome is the fact that plaintiffs should have been aware that their mail *might* be opened by the Soviet officials (particularly in the case of Ms. MacMillen,

who was writing to a well-known dissident). That could have convinced the trier of fact that there was no compensable damage. Indeed, the testimony of the plaintiffs with regard to their subjective feelings was both weak and meager. The nub of their testimony was that each felt "disappointment" that their own government could do such a thing. Such anguish is political rather than emotional, much as a member of a Senate investigating committee might feel toward the same revelation.[30] The "injury" was principally to "their wounded faith in our democratic institutions," 436 F.Supp. at 989, a loss of faith probably shared by many Americans who do not expect compensation for such intellectual injuries.

The issue comes down to whether each plaintiff suffered any mental injury whatever from the knowledge that a single letter had been opened. As the District Judge properly charged the advisory jury (and we assume charged himself), the plaintiffs could not recover money damages as a vindication of the rights of the American people. Nor do we think that they may recover simply to deter future action, for this particular statute prohibits punitive damages—the traditional "smart money" remedy used to discourage repetitive conduct.

The District Court did find, however, that "the emotional distress these plaintiffs suffered was the sort that would be experienced by reasonable people under the almost unprecedented circumstances of these cases." 436 F.Supp. at 988. Though we could view this finding as one merely of damage presumed from the circumstances, worth only the nominal sum of one dollar, *cf. Carey v. Piphus, supra*, we interpret the finding more generously as determining that these plaintiffs, whose demeanor the

---

**29.** Significantly, the CIA could not have refused to release this information under the Freedom of Information Act. Under the 1974 amendments, P.L. 93–502 § 2(b), an exception from disclosure is available with respect to an "agency conducting a lawful national security intelligence investigation," for confidential information "furnished only by [a] . . . confidential source." 5 U.S.C. § 552(b)(7)(D). The use of the word "lawful" indicates that Congress understood that there could be unlawful

intelligence investigations, and that the product of such operations would not be excepted from disclosure.

**30.** Except possibly for Senator Church, Chairman of the Senate Select Committee investigating intelligence activities, whose own personal mail to the Soviet Union had apparently been opened by the CIA. *See* Senate Report at 575–76.

trial judge observed, actually suffered personal anguish. We give "due regard . . . to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a). Though the question of damages is close, we affirm the money judgments for $1,000 each, with the feeling that they represent the upper limit of allowable compensation in these cases.[31]

■ With regard to the Judge's order that the Government send a letter of apology to each plaintiff, though such letters might some day achieve monetary value as collectors' items, we do not view them as "money damages," the only form of relief provided in the Act. 28 U.S.C. § 1346(b). See Moon v. Takisaki, 501 F.2d 389 (9th Cir. 1974); Frankel v. Heym, 466 F.2d 1226, 1228 (3d Cir. 1972).

We accordingly reverse that part of the judgment ordering that letters of apology be sent.

### V

■ Birnbaum cross-appeals on the ground that the District Court was in error because it denied his request for a jury trial, to which he contends he was entitled under the Seventh Amendment. He argues that the statute, 28 U.S.C. § 2402, which denies a right of jury trial, violates the Constitution because this is a suit at common law within the meaning of the Seventh Amendment.[32] "[S]uits against the Government, requiring as they do a legislative waiver of immunity, are not 'suits at common law' within the meaning of the Seventh Amendment. McElrath v. United States, 102 U.S. 426, 439–440, 26 L.Ed. 189." Glidden Co. v. Zdanok, 370 U.S. 530, 572, 82 S.Ct. 1459, 1484, 8 L.Ed.2d 671 (1962) (plurality opinion of Harlan, J.); see Cargill,

Inc. v. Commodity Credit Corp., 275 F.2d 745, 748 (2d Cir. 1960) (upholding statute barring jury trial of a counterclaim by the United States).

The judgments on appeal, except for the order to send letters of apology, are affirmed. The denial of the motion for a jury trial is also affirmed.

MOORE, Circuit Judge (concurring in part; dissenting in part):

I concur in Judge Gurfein's opinion both reluctantly and quite dubitante except as to part IV thereof, dealing with damages as to which I dissent. I say "reluctantly" because I cannot distinguish the Supreme Court's decision in United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); I say "dubitante" because but for that decision I might have believed that the opening of Soviet Union-U.S.A. correspondence might well be a "discretionary function or duty on the part of a federal agency" particularly since it matters not "whether or not the discretion be abused".

The CIA is an agency created by Congress to protect our national security in the international field. If the CIA's powers should be expanded or particularized, Congress is always free to so act. In the meantime the courts will continue to be plagued with the necessity of evaluating and balancing the basic values to be resolved, namely, "the duty of Government to protect the domestic security, and the potential danger posed by unreasonable surveillance to individual privacy and free expression". 407 U.S. at 315, 92 S.Ct. at 2135.

As to the amount awarded, even a one dollar sum (presumably the usual six cents

---

**31.** In affirming, we are cognizant that the Statute of Limitations has run by now on all unfiled mail opening claims for relief. The last mail opening occurred in 1973, Senate Report at 603–04, and no such program has existed thereafter. The matter was exposed to public knowledge long before the Rockefeller Report was published in June 1975, and even if either the New York statute of one year (CPLR § 215) or of three years (CPLR § 214) should be taken

to run from discovery with the exercise of due diligence—a most unlikely rule in this type of case—the statute has clearly run.

**32.** The Seventh Amendment provides in pertinent part:

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . .

now raised to one dollar because of inflation) would not be justified. The plaintiffs who had written the letters knew their contents. If "mental anguish" resulted from a revelation of their contents, the anguish was of their own creation. If the anguish was in the mind of the recipient, it was not created or enhanced by the government's mail opening. I would, therefore, restrict the damages to one dollar.