SOCIALIST WORKERS PARTY et
al., Plaintiffs,

v.

ATTORNEY GENERAL of the UNITED
STATES et al., Defendants.

No. 73 Civ. 3160.

United States District Court,
S. D. New York.

Dec. 15, 1978.

Leonard B. Boudin, Margaret Winter, Mary B. Pike, Rabinowitz, Boudin & Standard, New York City, for plaintiffs.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., by Thomas E. Moseley, Stuart Parker, Frank H. Wohl, New York City, for defendants.

## OPINION

GRIESA, District Judge.

On June 20, 1978 defendant United States of America filed a motion:

". . , for an order pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure dismissing the damage claims in the Second Amended complaint with respect to informant activity for lack of subject matter jurisdiction."

The "informant activity" referred to relates to informants used by the Federal Bureau of Investigation.

The principal grounds urged in the Government's original brief on this motion were that plaintiffs' claims as to the FBI informants are barred by the discretionary function exception, and by the exception relating to claims arising out of misrepresentation and deceit and interference with contract rights, in the Federal Tort Claims Act. 28 U.S.C. §§ 2680(a) and (h). The Government also reiterated an argument which had been raised and decided against the Government on an earlier motion—that the claims based on informant activity are barred by 28 U.S.C. § 2401(b) because of alleged failure to file a timely administrative claim.

While the motion was pending, the Court of Appeals handed down its decision in *Birnbaum v. United States*, 588 F.2d 319 (2d Cir. 1978), holding that there is no cause of action under the Federal Tort Claims Act for violations of the federal Constitution, since the Constitution is not deemed to be "the law of the place where the act or omission occurred" within the meaning of 28 U.S.C. § 1346(b). In the same opinion, however, the Court of Appeals held that surreptitious opening of mail by the CIA gave rise to a valid cause of action for invasion of privacy under the Federal Tort Claims Act, and that the cause of action was not barred by the discretionary function exception in 28 U.S.C. § 2680(a).

Following the *Birnbaum* decision, on November 20, 1978 the Government filed a "Supplemental Notice of Motion" alleging the following additional bases for dismissal of the damage claims against the United States for informant activity—that the Federal Tort Claims Act does not waive sovereign immunity for claims arising under the constitution, and plaintiffs' claims for informant activity do not state a claim under state law. The Government's accompanying Supplemental Memorandum cited *Birnbaum* on the constitutional tort issue, and made certain arguments about alleged infirmities in respect to plaintiffs' claims

under state law theories of prima facie tort, trespass and conversion, and invasion of privacy.

For the reasons hereafter set forth, the Government's motion is denied.

## I.

This is the second motion attacking the Federal Tort Claims Act causes of action. The first motion was filed in May 1976, and sought to forestall the filing of the First Amended Complaint, which introduced claims against the United States under the Federal Tort Claims Act. The Second Amended Complaint was filed in early July 1976 to clarify certain ambiguities in the First Amended Complaint. The Government's motion to preclude damage claims against the United States was denied on July 29, 1976.[1]

Thereafter, in connection with plaintiffs' motion for production of informant files, the Government advanced various arguments to the District Court, the Court of Appeals, and the Supreme Court about the legal infirmity of the damage claims against the United States, particularly in relation to informant activity.

However, following the Supreme Court's denial of certiorari on the informant file motion, and contemporaneously with the initiation of contempt proceedings against the Attorney General, the Government filed its new motion seeking to dismiss for lack of subject matter jurisdiction the damage claims against the United States with respect to informant activity. Certain of the points raised—particularly the argument about the statute of limitations—were raised two years ago and decided against the Government. However, there are other points—i. e., the arguments about the discretionary function exception, as applied to the FBI activity, the misrepresentation and deceit exception, and the alleged inapplica-

---

1. This ruling was reaffirmed in a statement November 3, 1977 following the Court of Appeals decision on the informant motion.

2. The arguments about the misrepresentation and deceit exception and the trespass and con-

bility of the theories of trespass, conversion and invasion of privacy—which had never been made, at least to the District Court, prior to the filing of the present motion in June 1978.[2]

## II.

The following is a summary of the allegations in the Second Amended Complaint relevant to the present motion.

Par. 3 alleges that the Socialist Workers Party ("SWP") is an unincorporated political party with members throughout the United States, having its national office in New York City. Par. 4 alleges that the Young Socialist Alliance ("YSA") is an unincorporated, nationwide organization of people 29 years of age and under, having its national office in New York City. Pars. 3 and 4 allege that the SWP and YSA engage in lawful forms of political activity, education and organizing.

Pars. 5–13 describe the individual plaintiffs as follows:

Jack Barnes—Member and National Secretary of the SWP.

Barry Sheppard—Member and National Organization Secretary of the SWP.

Farrell Dobbs—Member and former National Secretary of the SWP, and three-times candidate of the SWP for President of the United States.

Joseph Hansen—Member of the National Committee of the SWP.

Peter Camejo—Member of the SWP, and 1976 candidate for President of the United States.

Willie Mae Reid—Member of the SWP and 1976 candidate for Vice President of the United States.

Linda Jenness—Member of the SWP and 1972 candidate for President of the United States.

Andrew Pulley—Member of the SWP and 1972 candidate for Vice President of the United States.

---

version theories were never made to the District Court prior to the filing of the new motion, although the Government mentioned them in its briefs to the Court of Appeals and the Supreme Court on the informant file motion.

Norman Oliver—Member of the SWP and 1973 candidate for Mayor of New York City.

Evelyn Sell—Member of the SWP.

Morris Starsky—Member of the SWP.

Charles Bolduc—Michigan organizer for the SWP during 1972 election campaign.

Certain defendants are named by official title, including the Attorney General of the United States, the Director of the Federal Bureau of Investigation, the Director of Central Intelligence, the Postmaster General, and others. Former President Nixon and former Attorney General John Mitchell and others are named as defendants individually, including three employees of the FBI, allegedly connected with the New York office—John F. Malone, Arthur J. Greene, Jr., and George P. Baxtrum, Jr. There is a category of defendants designated "Unknown Agents of the United States Government." The United States of America is also named as a defendant.

Pars. 19–73B contain the allegations of alleged wrongdoing.

Par. 19 alleges that commencing in 1938 and continuously thereafter the defendant officials, including the Director of the FBI, caused agents of the United States to engage in a systematic campaign of excessive interrogation, employment discrimination and other harassment against the SWP, the YSA, their members, candidates, and supporters, and to spy upon them by warrantless electronic surveillance, unauthorized mail covers, burglary, secret government agents, and other similar means.

Par. 20 alleges that commencing in 1961 J. Edgar Hoover and others agreed to implement and expand the activities referred to in Par. 19 by establishing and operating within the FBI the "Socialist Workers Party—Disruption Program" and related programs designated as COINTELPRO programs.

Par. 21 alleges that during the months July-November 1970 a group of defendants consisting of President Nixon, Attorney General Mitchell and others agreed to implement and expand the above described activities by intensifying the use of burglaries and other illegal tactics.

Par. 23 alleges that, pursuant to the agreements and plans described in Pars. 19–21, the defendant officials caused the specific activities and events described in Pars. 24–70.

Par. 26 alleges that the Director of the FBI and other defendant officials caused government informers to secretly infiltrate the SWP and YSA and induced members and supporters of SWP and YSA to become secret government informers, all for the purpose of spying, interfering with lawful organizing and political campaigning, and attempting to control and direct the activities of the SWP and YSA. Par. 27 alleges that many of the secret government informers were and are active members of the SWP and the YSA and participate in the formulation of policy and the selection of electoral candidates.

Pars. 28–32 allege that the Director of the FBI and his agents have singled out for interrogation and surveillance the SWP, the YSA, and hundreds of their members, electoral candidates, and supporters, and used pressure, threats, bribery and other enticements to induce SWP and YSA members and supporters to withdraw their support from these organizations. It is alleged that FBI agents also contacted and interrogated landlords, employers, prospective employers, families, and friends of SWP and YSA members and supporters, for the purpose of provoking hostility and discrimination against SWP and YSA members and supporters.

Pars. 33–39 allege that the FBI caused plaintiffs Sell and Starsky to be discharged from teaching positions.

Par. 40 alleges that FBI agents circulated anonymous letters concerning the SWP and YSA and their members and carried out other operations designed to provoke hostility against and within these organizations and their membership, and thereby to disrupt the SWP and YSA and prevent their growth.

Par. 41 alleges that the activities of the FBI were unrelated to detecting crime or to any other lawful FBI activity.

Pars. 42 and 43 allege unlawful infiltration, surveillance and interference with travel, committed by the CIA in collaboration with the FBI.

Pars. 44–50 allege wrongdoing, including discrimination, on the part of the Civil Service Commission, the Department of the Army, and the Selective Service System.

Pars. 51–55 allege illegal electronic surveillance on the part of the defendant officials, including the Director of the FBI.

Pars. 56–59 allege illegal examinations of mail carried out by the FBI and other agencies.

Pars. 60, 60A, 60B, 60C and 60D allege that FBI agents, including individual defendants Malone, Greene and Baxtrum, have directed and committed burglaries in the national offices of the SWP and the YSA in New York City and other premises of the organizations and their leaders and electoral candidates.

Pars. 61–70A allege various specific break-ins and other incidents in Chicago, Detroit, New York, Los Angeles and Houston believed to have been caused by the FBI and other federal agencies.

Pars. 73, 73A and 73B allege that the Director of the FBI and other defendant officials collected, used, and disseminated millions of items of information regarding persons affiliated with the SWP and YSA, which information was collected by means of informers, infiltrators, interrogations, illegal wire taps, break-ins and mail surveillance. It is alleged that the FBI and other federal agencies used this information, among other things, to disrupt the SWP and YSA and otherwise injure these organizations and their members. Par. 73B alleges that the acts referred to are not expressly authorized by statute and are not pertinent to or within the scope of any authorized law enforcement activity.

Pars. 84–98 set forth the legal theories upon which the claims are based.

Plaintiffs refer to the First, Fourth and Fifth Amendments to the federal Constitution, and to various federal statutes. For purposes of the present motion relating to the Federal Tort Claims Act, the theories which require discussion are the other theories based on state law, in view of the fact that the recent *Birnbaum* decision, *supra*, holds that there is no cause of action under the Tort Claims Act for violation of the federal Constitution.

Par. 84 alleges, among other things, that the activities of defendants and their agents in disrupting the SWP and YSA and preventing their growth, constituted malicious attempts to interfere with and destroy these organizations and the conduct of their business, in violation of the law of prima facie tort of the State of New York. Par. 84 and various other paragraphs also rely on theories of trespass, conversion and assault. There are several allegations of deprivation of "privacy and anonymity . . . in violation of the First Amendment" (pars. 85, 89, 91 and 92). Plaintiffs have now made it clear that they are alleging a common law right of privacy theory as a basis for Tort Claims Act recovery, relying in part on the recent *Birnbaum* decision, *supra*.

Par. 99A alleges that on July 17, 1975 plaintiffs SWP and YSA presented their administrative claims for damages against the United States to the FBI, and on October 3, 1975 plaintiffs Sell and Starsky presented such claims to the FBI, which claims have not been honored.

It should be noted that on July 22, 1976 the SWP and YSA filed administrative claims against the FBI regarding break-ins in New York City, and regarding certain FBI COINTELPRO programs.[3] On October 28, 1976 the SWP and YSA filed administrative claims against the FBI making further allegations of wrongdoing by FBI

---

**3.** On the same date the SWP and YSA filed an administrative claim against the Secretary of the Army relating to the incident in Chicago

referred to in pars. 61–62 of the Second Amended Complaint.

agents in respect to burglaries, and allegations of wrongdoing by FBI confidential informants in respect to disruption activities, manipulation and influence, burglaries, and unlawful gathering and dissemination of private information.

With respect to the specific damage claims, these are set forth in pars. 75 and 77–83, and in section B of the request for relief—alleging injuries and dollar amounts of damages.

Certain of the paragraphs alleging injuries are *not* the basis for damage claims, but only claims for injunctive relief. One of these is par. 76, which alleges that as a result of the systematic operation of secret government agents who pose as members of the SWP and YSA, plaintiffs' ability to participate freely in the political process was and is seriously impaired. No monetary damages are alleged in par. 76. However, as the Government concedes (Minutes of November 21, 1978 p. 10), and as is otherwise clear, par. 75 is an allegation of monetary damages resulting from, *among other things*, FBI informant activity. Par. 75 alleges that as a result of the operations of the FBI designed to disrupt the SWP and the YSA and interfere with their political activity and prevent their growth, the SWP and YSA have sustained damages in the form of suppression of rights of free speech and association, and in the form of reduced support, membership and revenues in the amount of $6 million and $4 million respectively.

The SWP and YSA also allege damage claims against the United States for illegal wiretapping, mail opening, break-ins and removal of documents, other invasions of privacy, and the incidents of burning and terrorism.

Plaintiffs Sell and Starsky seek damages for their loss of employment allegedly caused by FBI activity.

Although other individual plaintiffs seek damages against the United States, their claims are not involved in the present motion relating to FBI informant activity.[4]

## III.

The Government's present motion is based on the hypothesis that the "claims . . . with respect to informant activity" are distinguishable from the other claims in the case in ways relevant to subject matter jurisdiction under the Federal Tort Claims Act. In other words, according to the Government, whatever relates to non-informant activity constitutes validly pleaded claims under the Federal Tort Claims Act, and whatever relates to informant activity does not. There is no rational basis for such a proposition.

The damage claims which embrace FBI informant activity fall into two categories. *First*, there is the claim relating to the alleged FBI disruption program, alleging that beginning in 1961 the FBI had a program expressly designed to disrupt and weaken the SWP and YSA. The complaint alleges various devices used to carry out this program—including harassment of members, burglaries, wiretaps, mail openings, anonymous letters, *and* infiltration by informants. Pars. 20–70, 75 and 84 allege the disruption program claim. The common law theory referred to is the law of prima facie tort. *Second*, there are claims—in addition to, or alternative to, the disruption program claim—of discrete torts. These are claims for invasions of privacy, trespass and conversion. Pars. 73, 73A, 73B, and 83 in effect reallege, as separate tort claims, the various activities carried on in furtherance of the disruption program.

The disruption program claim is asserted only by plaintiffs SWP and YSA. The damages claims in the second category, relevant to this motion, are those asserted by plaintiffs SWP, YSA, Sell and Starsky.

---

**4.** The Second Amended Complaint does not allege the filing of administrative claims under the Federal Tort Claims Act by any plaintiffs other than the SWP, the YSA, Sell and Starsky. Certain other administrative claims were filed by other plaintiffs at or near the time of the filing of the Second Amended Complaint. However, these claims were against agencies other than the FBI. On March 10, 1978 certain of the individual plaintiffs filed administrative claims against the FBI, solely related to wiretapping.

The allegations about the FBI disruption program were made after plaintiffs had obtained in discovery certain FBI documents relating to the programs. These documents contain numerous references to the express purpose of the FBI to disrupt the SWP and YSA and to cause the withdrawal of members, inhibition of growth and diminution of revenues, and also to interfere with the activities of these organizations both generally and in specific instances. Specific disruptive actions are described with evaluations of success or failure. The documents indicate a close relationship between the activities of FBI officials and agents, and activities of informants. The documents indicate that, at the very least, the FBI officials and agents depended upon information supplied by informants for planning the disruptive activities and evaluating their results.

The Government argues on this motion (Reply Memorandum pp. 8–9) that there were "only a few instances in which informants may have been directed to take positions that were calculated to be disruptive" and that these instances "have already been revealed to the plaintiffs in the documents previously produced." This argument ignores the role of the informants in supplying information to FBI agents for use in the disruption program. In any event, it would be totally inappropriate to make any factual finding on the present record to the effect that the role of the informants in the disruption program was within some narrowly prescribed limits which the Government suggests. The mere functioning of informants, at a time when the FBI's announced purpose was to disrupt the SWP and YSA, is enough to raise serious questions of fact as to how and to what extent the informants acted in such a way as to further the disruption program. As to the argument that the files already produced

are sufficient (the corollary of the proposition being that the informant files have little or no bearing on the disruption program[5]), this is simply wrong. The FBI files already produced, to which the Government is referring, are memoranda and reports of FBI agents and officials. They are in many respects fragmentary and incomplete.[6] They often refer to, *but do not contain*, the first-hand reports of the informants about what these informants did and observed within the SWP and YSA organizations. The informant files do contain these first-hand reports, and are an essential body of evidence to accompany and supplement the reports and memoranda of FBI agents and officials.

There are no "claims . . . with respect to informant activity" which can be treated separately as far as Tort Claims Act jurisdiction is concerned. No rational basis exists for upholding jurisdiction of the disruption program claim in respect to FBI "agent activity," and denying jurisdiction of the disruption program claim as to "informant activity." No basis exists for upholding jurisdiction over an invasion of privacy claim for mail openings by FBI agents, and denying jurisdiction over an invasion of privacy claim for inspection of mail or other private documents by informants.

█ Thus the Government's basic assumption in the present motion, about separate treatment of the informant issues for jurisdictional purposes, is anomalous and unrealistic. Also, for the reasons to be stated, the Government's various legal arguments must be rejected.

### IV.

█ The disruption program claim in the Second Amended Complaint is a sufficient claim under state law.

---

5. The Government's initial memorandum on the present motion announces that at least one purpose of the motion was to make additional arguments that the eighteen informant files should not be produced.

6. These documents contain numerous references to informants by number. At the time

the documents were produced, it was agreed that the Government, for the time being, could expunge all material which would identify informants. This has led to very liberal expurgations. The extent to which these expurgations can be maintained remains to be decided in the further pre-trial proceedings.

With respect to the disruption program claim, as with all the state law claims, there has been no attempt by either the Government or plaintiffs to deal with choice of law problems. New York law has been primarily relied upon in connection with the disruption program claim. New York is, of course, the location of the national offices of both the SWP and YSA. Both sides assume that, if the Second Amended Complaint pleads a good cause of action under New York law with respect to the disruption program claim, this is sufficient to satisfy § 1346(b) for jurisdictional purposes.

The disruption program claim, as already described, alleges that the FBI engaged in a deliberate program to disrupt the SWP and YSA and their activities, and to deprive these organizations of members and funds. The claim regarding this program and its various devices contains some elements of the torts of invasion of privacy, conversion, and trespass. However, the overall disruption program claim is arguably different from, and contains elements in addition to, any one of these torts.

For this reason plaintiffs rely on the theory of "prima facie tort." This theory derives in part from a statement of Justice Holmes in *Aikens v. Wisconsin*, 195 U.S. 194, 204, 25 S.Ct. 3, 5, 49 L.Ed. 154 (1904), that "prima facie, the intentional infliction of temporal damages is a cause of action, which, as a matter of substantive law, whatever may be the form of pleadings, requires a justification if the defendant is to escape." The doctrine of prima facie tort has come into use in order to provide recovery in cases of intentional infliction of injury, where other more traditional forms of action would not apply.

*Morrison v. National Broadcasting Co.*, 24 A.D.2d 284, 266 N.Y.S.2d 406 (1st Dept. 1965), is a leading New York decision in this area. There the plaintiff complained that he had been wrongfully induced to participate in a noted television quiz show, which was subsequently exposed as rigged, resulting in damage to his reputation and possible loss of certain academic fellowships. The trial court had dismissed the complaint.

The Appellate Division, First Department, reversed, in an opinion by the then Presiding Justice Breitel. The opinion defined prima facie tort as the intentional infliction of injury, by otherwise lawful means, without economic or social justification. Justice Breitel held that the wrongdoing pleaded in the *Morrison* case was not strictly speaking prima facie tort, because the means there used were corrupt and wrongful. Of course, this made the tort more grievous than prima facie tort as defined. The opinion held that there was a cause of action for general intentional tort covering the wrongdoing alleged in that case, quoting the following passage from an earlier Appellate Division opinion, *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.*, 7 A.D.2d 441, 443–44, 184 N.Y.S.2d 58, 60–61 (1st Dept. 1959).

"It seems inadvisable to lump all malicious and intentional harms into a grab bag labeled 'prima facie tort', especially since it is impossible to tabulate the infinite varieties of misconduct that give rise to actionable wrongs. It is generally accepted that 'There is no necessity whatever that a tort must have a name. New and nameless torts are being recognized constantly.' (Prosser, Torts [2d ed.], p. 3.)

"What is important is that there must be the infliction of intentional harm, resulting in damage, without legal excuses or justification."

The Appellate Division holding in *Morrison*, sustaining the complaint in that case, was reversed by the New York Court of Appeals. The reversal was based on the statute of limitations and also on the view that there was a failure to plead special damages. The court regarded the damage claim as entirely speculative. *Morrison v. National Broadcasting Co.*, 19 N.Y.2d 453, 280 N.Y.S.2d 641, 227 N.E.2d 572 (1967).

However, Justice Breitel's opinion, insofar as it discusses the basic elements of the general intentional tort theory, was recently cited with approval by the Court of Appeals in *Board of Education of Farmingdale v. Farmingdale Classroom Teachers Association, Inc.*, 38 N.Y.2d 397, 380 N.Y.S.2d 635,

343 N.E.2d 278 (1975).[7] This was a suit by a school district claiming that a teachers' association had, in a pending legal proceeding, served subpoenas on 87 teachers and refused to stagger their appearances, all with an intent to harass the school district, which caused the school board to hire excess substitute teachers. The complaint pleaded, in the alternative, claims for abuse of process and prima facie tort. The Court of Appeals stated (38 N.Y.2d at 405, 380 N.Y.S.2d at 644, 343 N.E.2d at 284):

> "Lastly, we conclude that the third cause of action for prima facie tort is sufficient insofar as it refers to the intentional infliction of economic harm by forcing plaintiff to hire a great many substitutes. It does not matter whether the action is denominated a so-called 'prima facie tort' or is called something else [citations omitted]. Although in *Opera on Tour v. Weber*, 285 N.Y. 348, 34 N.E.2d 349, the court referred to a prima facie tort (with less than an accurate reference to the theory which Mr. Justice Holmes had articulated in *Aikens v. Wisconsin*, 195 U.S. 194, 204, 25 S.Ct. 3, 49 L.Ed.2d 154) that term is merely an inaccurate mislabel and the plaintiff's right to maintain an action does not hinge on the label used (*Knapp Engraving Co. v. Keystone Photo Engraving Corp.*, 1 A.D.2d 170, 172, 148 N.Y.S.2d 635, 637). The operative fact here is that defendants have utilized legal procedure to harass and to oppress the plaintiff who has suffered a grievance which should be cognizable at law. Consequently whenever there is an intentional infliction of economic damage, without excuse or justification, we will eschew formalism and recognize the existence of a cause of action."

The Court of Appeals held that the cause of action for prima facie or general intentional tort was sufficiently pleaded, and could be alleged as an alternative to the abuse of process claim, stating (38 N.Y.2d at 406, 380 N.Y.S.2d at 645, 343 N.E.2d at 285):

> "It is our view that a modern system of procedure, one which permits alternative pleading, should not blindly prohibit that pleading in the area of prima facie tort. Of course, double recoveries will not be allowed, and once a traditional tort has been established the allegation with respect to prima facie tort will be rendered academic. Nevertheless there may be instances where the traditional tort cause of action will fail and plaintiff should be permitted to assert this alternative claim."

*See also Smith v. Fidelity Mutual Life Ins. Co.*, 444 F.Supp. 594, 598 n.6 (S.D.N.Y.1978).

In the present case, plaintiffs' claim regarding the FBI disruption program is valid under these authorities. Indeed, it falls within the category of aggravated general intentional tort described by Presiding Justice Breitel in *Morrison*. The claim in the present case is not merely for intentional harm by otherwise lawful means, but for intentional harm by means which are illegal and corrupt. There can be little doubt that an analogous claim arising in a New York court would be sustained—for instance, if a civil rights organization sued alleging that a hostile group had engaged in various kinds of disruptive activity designed to weaken or destroy the plaintiff organization.

In the present case, the SWP and YSA have pleaded the requisite harm in the form of reduction in membership and revenues, and the impairment of their functioning as an organization. According to the *Farmingdale* case, the claim for prima facie or general intentional tort may be pleaded as an alternative to claims under other tort theories, as has been done by the SWP and YSA.

The Government contends that prima facie tort is limited to commercial contexts, citing *Hammer v. Polsky*, 36 Misc.2d 482, 233 N.Y.S.2d 110 (Spec.Term N.Y.Cnty. 1962). That case has not been followed. The *Farmingdale* case was not in a "commercial context," but was a suit by a public entity.

---

**7.** At the time of *Farmingdale*, Breitel had become Chief Judge of the Court of Appeals.

The Government also argues that the prima facie tort theory must be dismissed because of a failure to plead special damages, citing *ATI, Inc. v. Ruder & Finn, Inc.*, 42 N.Y.2d 454, 398 N.Y.S.2d 864, 368 N.W.2d 1230 (1977), and other decisions. The SWP and YSA have made a sufficient pleading of injury and damages. They allege loss of members and revenues, and impairment of the functioning of their organizations. These allegations constitute valid damage claims, particularly in view of the allegations that it was the express purpose of the FBI disruption program to diminish the membership and revenues of the SWP and YSA and to interfere with the activities of these organizations both generally and with regard to specific functions.

The damage allegations in the Second Amended Complaint are to some degree general, although they describe the basic elements of damages. The specifics can only be developed by permitting plaintiffs to complete their discovery and offer their proof at trial. *See Catalano v. Capital Cities Broadcasting Corp.*, 63 Misc.2d 595, 313 N.Y.S.2d 52 (Spec.Term Albany Cnty. 1970).

### V.

■ Another valid state law claim asserted by the SWP and YSA is for invasion of privacy. A major phase of this claim relates to the alleged use of informants to infiltrate private meetings, to overhear and report upon private discussions and conversations, and to read, copy and steal private documents, including membership lists.

*Birnbaum v. United States*, 588 F.2d 319 (2d Cir. 1978), upheld, as valid under New York law and the Federal Tort Claims Act, a cause of action for invasion of privacy in connection with opening of mail by the CIA. This ruling plainly applies to the types of intrusions alleged in the present case.

The Government's only argument against a right of privacy cause of action in the present case is that such a claim can only be asserted by an individual, and not by an association. The Government relies upon *Restatement (Second) of Torts*, § 652I. Section 652I does indeed state that the right of privacy relating to unreasonable intrusion can only be asserted by an individual, and not by a corporation, partnership or unincorporated association.[8]

The plaintiffs in *Birnbaum* were individuals. Indeed, no case has been cited squarely recognizing a right of action for damages in favor of a corporation or association for invasion of privacy consisting of unreasonable intrusion.

However, as Judge Breitel stated in a New York Court of Appeals case dealing with another phase of the right of privacy,

---

**8.** The Government relies on a statement by Justice Jackson in *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 184, 71 S.Ct. 624, 655, 95 L.Ed. 817 (1951), that "the right of privacy does not extend to organized groups or associations which solicit funds or memberships or to corporations dependent upon the state for their charters." In this case, the Supreme Court held that the Anti-Fascist Committee had standing to sue for a review of the Attorney General's designation of the committee on a list of Communist organizations. Six separate opinions were filed. All of the six justices in the majority, except Justice Jackson, appear to have recognized that the committee had a legally protected right of its own, as distinct from the individual rights of its members. *See* opinion of Burton, J., 341 U.S. at 140–41, 71 S.Ct. 624. Justice Jackson was of the view that the committee had no legally protected interest of its own, since it had no right to be free from public criticism or expo-

sure (*id.* at 184, 71 S.Ct. 624). However, Justice Jackson was of the view that the committee had standing to assert the interests of its members. Justice Jackson's statement about the lack of a privacy right in the case of an association cited *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), which held, among other things, that the Federal Trade Commission did not violate the Fourth Amendment in requiring certain reports from corporations. It seems clear that Justice Jackson's statement does not represent persuasive authority against granting a right of privacy to plaintiff organizations in the present case. The Supreme Court in *NAACP v. Alabama*, 357 U.S. 449, 459–60, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958), held that the NAACP had standing to make the complaint in that case because of the "reasonable likelihood that the Association itself through diminished financial support and membership may be adversely affected" by the wrongs complained of.

the classifications in the law of privacy cannot be regarded as "either frozen or exhausted." *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 572, 307 N.Y.S.2d 647, 657, 255 N.E.2d 765, 772 (1970) (concurring opinion). Indeed, the introductory comment in the Restatement section on Invasion of Privacy states:

> "Nothing in this Chapter is intended to exclude the possibility of further developments in the tort law of privacy."

The court in *Birnbaum* did not have any New York precedent which squarely authorized a right of privacy action for intrusion. Indeed a Court of Appeals case of many years ago contained general language unfavorable to such a cause of action. Nevertheless, the *Birnbaum* court examined recent developments in the law, including cases under the federal Constitution, and concluded that the New York courts would now recognize a cause of action for violation of the right to be free from unreasonable intrusion.

■ This right of action should, as a matter of reason and principle, apply to an association. If the mail involved in *Birnbaum* had been addressed to an association, it is inconceivable that the court would have denied recovery on that ground.

Indeed one of the authorities cited in *Birnbaum* is *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Although this case, holding that the Alabama Attorney General could not require the NAACP to reveal the names of its Alabama members, was decided under the Constitution, it nevertheless clearly stands for the proposition that an association has a legally protected right of privacy. The protection of the association's privacy is necessary for the protection of the privacy of the members. Mr. Justice Harlan, writing for a unanimous Court, stated (*id.* at 459, 78 S.Ct. at 1170):

> "Petitioner is the appropriate party to assert these rights, because it and its members are in every practical sense identical." [9]

The Court emphasized the unique importance of privacy in the case of a political association (p. 462, 78 S.Ct. p. 1171):

> "This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."

The Court further stated (p. 466, 78 S.Ct. p. 1174):

> "We hold that the immunity from state scrutiny of membership lists which the Association claims on behalf of its members is here so related to the right of the members to pursue their lawful private interests privately and to associate freely with others in so doing as to come within the protection of the Fourteenth Amendment."

■ It must be concluded that, at least in New York, the law would recognize a right of action on the part of the SWP and YSA to recover for unreasonable intrusions of the kind alleged in the Second Amended Complaint.[10]

## VI.

The Government asserts that there is no valid cause of action in trespass or conversion relating to the alleged misappropriation of documents (Supplemental Memorandum p. 6). The Government goes on to state that the actions of informants in merely copying documents did not constitute trespass or conversion.

■ The Government ignores the claims as pleaded. The Second Amended Complaint alleges that the FBI was responsible for break-ins (trespass to real property)

---

9. *See also Warth v. Seldin*, 422 U.S. 490, 511, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

10. It is clear that an unincorporated association has standing to assert damage claims for injury to itself. *Warth v. Seldin*, 422 U.S. 490, 511, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *International Woodworkers v. Georgia-Pacific Corp.*, 568 F.2d 64, 66 (8th Cir. 1977).

and, among other things, stealing of documents (conversion of personal property). It is clear that plaintiffs claim such conduct both by FBI agents and informants. The extent to which such torts can be proved remains to be seen; but the claims for trespass and conversion are sufficiently pleaded.

## VII.

The Government contends that the claims regarding informant activity are barred by the discretionary function exception in 28 U.S.C. § 2680(a), which provides:

"The provisions of this chapter and section 1346(b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

 A discretionary function can derive only from properly delegated authority. The function must be within the authority or competence of an agency or official, as delegated by statute, regulation, or jurisdictional grant. *Birnbaum v. United States, supra* (pp. 329–330).

The relevant grants of authority to the Department of Justice and the FBI authorize the *investigation* of violations of laws of the United States and *investigative* work in matters relating to espionage, sabotage, subversive activities and related matters. 28 U.S.C. § 533; 28 C.F.R. § 0.85.

The Government's argument about discretionary function is based upon its own definition of informant activity—*i. e.*, that the informants were used to investigate actual or potential crime, and that their activities consisted of gathering information and doing whatever else was necessary to protect their cover.

The trouble is that this definition bears little resemblance to what plaintiffs are claiming in this lawsuit. As already described, plaintiffs claim that the informants were used as a device to further the disruption program. Plaintiffs also claim that the infiltration accomplished by the informants and their gathering of information had no legitimate law enforcement purpose.

Nothing has been cited which authorizes the FBI to engage in a function such as the disruption program alleged in this case, or the use of informants to further such a program. These activities are outside the function of investigating crime and subversion. The Government has virtually conceded that the discretionary function exception does not apply to the claim regarding use of informants in connection with the disruption program. It does not "press this point very much." (Minutes of November 21, 1978 pp. 22–23). Clearly the discretionary function exception has no application to the disruption program.

 Even if we were to put aside the disruption program, there would still be a claim that the FBI "investigation," in which the informants assisted, was directed against lawful organizations and their lawful political activities, and had no crime-detection or other law enforcement purpose. This claim, as alleged, is not based upon a discretionary function. There is no authority granted to the FBI to infiltrate organizations and gather information solely about political beliefs and lawful political and personal activities. *Cf. Gibson v. Florida Legislative Committee*, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963) (concurring opinion of Douglas, J.).

 The Second Amended Complaint states valid claims for alleged wrongdoing not based upon the exercise of a discretionary function.

It should be stated that the argument about discretionary function appears to raise issues for trial. All that is being decided now is that the claims as alleged do not fall within the discretionary function exception.

## VIII.

The Government contends that the claims regarding informant activity are barred by the exceptions in 28 U.S.C. § 2680(h) relating to claims arising out of misrepresentation and deceit. The Government maintains that the deception of the informants in posing as SWP and YSA members and in concealing their connection with the FBI renders the claims in this case ones for misrepresentation and deceit.

The short answer to this argument is that plaintiffs are not suing on the torts of misrepresentation and deceit—but upon prima facie or general intentional tort, invasion of privacy, trespass and conversion. The differences are not formal but essential. *See Lambertson v. United States*, 528 F.2d 441 (2d Cir.), *cert. denied*, 426 U.S. 921, 96 S.Ct. 2627, 49 L.Ed.2d 374 (1976).

The Supreme Court has specifically dealt with the type of problem here raised. The Court has noted that many torts other than misrepresentation and deceit involve elements of misrepresentation in the generic sense of the word, but has warned against any idea of bringing these other defined torts within the ambit of the misrepresentation and deceit exception in § 2680(h). *United States v. Neustadt*, 366 U.S. 696, 711 n.26, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961).

In the present case the gravamen of the claims is not misrepresentation or deceit, and the Government cannot be permitted to recharacterize the claims so as to artificially fit them within the exceptions of § 2680(h). *See Black v. Sheraton Corp.*, 184 U.S.App.D.C. 46, 55, 564 F.2d 531, 540 (1977); *Betesh v. United States*, 400 F.Supp. 238, 241 n.2 (D.D.C.1974).

The Government also appears to argue that plaintiffs' claims, or some of them, are barred by the exception in § 2680(h) relating to interference with contract rights. Although there has been some discussion in various arguments of plaintiffs about a theory of interference with advantageous relationships, the causes of action pleaded in the Second Amended Complaint are clearly based on other theories.

Insofar as plaintiffs Sell and Starsky claim loss of employment, it could be argued that this is a cause of action for interference with contract. However, the gravamen of their claims is prima facie tort and invasion of privacy, even though the resulting injury may have been loss of an employment contract. Under these circumstances the exception does not apply. *Black v. Sheraton Corp., supra.*

## IX.

Only a brief mention is required regarding the Government's statute of limitations argument under 28 U.S.C. § 2401(b). That section provides that a tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues. The Government contends that plaintiffs' cause of action regarding FBI informant activity accrued much more than two years prior to the filing of any administrative claim, and is therefore barred.

The statute of limitations point was the principal subject of the May 1976 motion. The motion was denied on July 29, 1976, and this denial was reaffirmed on November 3, 1977.

In that ruling, I applied the accrual standard of when plaintiffs discovered, or should have discovered, information sufficient to apprise them of their claim. *See Toal v. United States*, 438 F.2d 222 (2d Cir. 1971); *Ashley v. United States*, 413 F.2d 490, 493 (9th Cir. 1969); *Hammond v. United States*, 388 F.Supp. 928 (E.D.N.Y.1975); *Kilduff v. United States*, 248 F.Supp. 310, 313 (E.D.Va.1961). Under such a standard, the time of accrual depends upon factual questions. I held, among other things, that the record presented on the motion indicated that plaintiffs neither knew, nor should have known, about the disruption program more than two years prior to filing their administrative claim on July 17, 1975. I adhere to this, and other phases of my ruling, denying the motion to dismiss on limitation grounds. No new materials or arguments have been presented.

One point, however, should be added. Even if the Government should be correct in arguing for a two-year cutoff prior to the filing of the administrative claims, this would still leave standing all claims for wrongdoing which occurred, and damages which arose, *during this two years.* Since the administrative claim regarding the FBI disruption program was filed in July 1975, at the very least plaintiffs could recover for whatever would fall within this administrative claim, going back to July 1973. To the extent that reliance must be placed on the later administrative claim alleging certain specific wrongdoing by informants (filed in October 1976), recovery could be had, at the very least, for events occurring back to October 1974. The discovery materials produced by the Government indicate that there was very substantial informant activity during the years 1973, 1974, 1975 and 1976.

### Conclusion

For the foregoing reasons, the Government's motion to dismiss the Tort Claims Act claims against defendant United States of America with respect to FBI informant activity is denied.

So ordered.